**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

VO TRAN,

        *Plaintiff*,

    v.

U.S. DEPARTMENT OF JUSTICE, *et al.*,

      *Defendants.*

Civil Action No. 18-739 (RDM)

---

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Vo Tran, proceeding *pro se*, brings this action against the U.S. Department of Justice, the Federal Bureau of Investigations ("FBI"), the Office of Information Policy ("OIP"), the U.S. Attorney's Office for the Central District of California, and the Executive Office for U.S. Attorneys ("EOUSA") under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the Privacy Act, 5 U.S.C. § 552a. Tran, a former FBI agent, seeks records from the FBI and EOUSA from 1997 to 2017 "related to the criminal investigation and prosecution" of Tran "by Federal authorities." Dkt. 57-3 at 21–22. He also requests information from the FBI related to two men that Tran says were involved in the FBI's investigation: Alex T. Dao and Andrew Cho. *Id.* at 22, 26. In response to Tran's requests for information about himself, the FBI released 5,808 pages of documents (some with redactions) and withheld 1,014 unique pages, and EOUSA released 372 pages (some with redactions) and withheld 92 pages. Dkt. 57-1 at 11, 18, 63. In response to Tran's requests for information about Dao and Cho, however, the FBI issued a Glomar response in which it declined to confirm or deny whether any responsive records existed. *Id.* at 19.

The matter is now before the Court on Defendants' motion for summary judgment. Dkt. 57. Although Tran does not take issue with any specific withholdings, he opposes that motion on several grounds: First, he argues that a Glomar response was improper with respect to Dao, because the FBI purportedly "confirmed" Dao's alleged role as a confidential informant ("CI") in the investigation of Tran in a civil case between Dao and the FBI and at Tran's criminal trial. Tran does not make the same objection with respect to the Glomar response to his request for information about Cho. Second, Tran maintains that "each and every one" of the "litany of other rationale[s]" that the FBI cites for failing to disclose information about Dao is "dispelled by virtue of their prior confirmation that D[ao] was a CI for them." Dkt. 63 at 8. Third, he contends that "any other rationale" given for withholding *any* documents responsive to his requests is "easily dismissed" and asks that the Court either order Defendants to release all documents to Tran under seal or review each of the withheld documents *in camera* to "discern for itself the lack of justification" for withholding them. *Id.* Finally, he argues that Defendants' motion was filed "without a 'good-faith' basis" because Defendants should have known that a Glomar response was unavailable with respect to Dao. *Id.* at 7.

For the reasons explained below, the Court concludes that the FBI has not met its burden of establishing that a Glomar response was appropriate with respect to Dao. The Court will, accordingly, **DENY** without prejudice Defendants' motion for summary judgment with respect to Tran's request for records about Dao. In contrast, Tran does not challenge the FBI's Glomar response with respect to Cho, and, accordingly, the Court will **GRANT** summary judgment in favor of Defendants with respect to Tran's request for information about Cho. Finally, the Court will **GRANT** in part and **DENY** in part summary judgment to Defendants with respect to Tran's request for records about himself or the criminal case that resulted in his conviction. With one

exception discussed below, Defendants have carried their burden of demonstrating that they conducted adequate searches, withheld only exempt records, and segregated responsive material where possible.

## I. BACKGROUND

Tran's efforts to obtain the records at issue in this case got off to a slow start. On May 19, 2012, he submitted a two-part FOIA and Privacy Act request to the FBI. Dkt. 57-3 at 2. The first part requested all FBI records pertaining to Tran himself: his personnel file, his administrative file, and his "OPR" file from when he was employed with the FBI, as well as all files related to his criminal prosecution. *Id.* The second part sought "all information and documents in [FBI] possession related [to] Alex Trung Dao (The cooperating witness/confidential informant utilized in my criminal case.)." *Id.* In support of his request for information about himself, Tran provided a signed certificate of identity. *Id.* at 3. He did not, however, provide a signed privacy waiver on behalf of Dao or proof of Dao's death.[1] Dkt. 57-8 at 2 (Defs.' SUMF ¶ 1). The FBI acknowledged receipt of Tran's request, located "approximately 3,262 pages of records potentially responsive to [his] request," and sent Tran an estimate of what Tran would owe the FBI to cover the applicable duplication fees. Dkt. 57-3 at 6, 8. The FBA also requested that Tran indicate "in writing if [he] would like to discuss reducing the scope of [his] request and [his] willingness to pay the estimated search and duplication costs." *Id.* at 8. According to the FBI, after waiting thirty days with no response from Tran, the FBI closed the request. Dkt. 57-8 at 2 (Defs.' SUMF ¶ 4). Tran's attorney at the time, however,

---

[1] Without one of those documents, the FBI will not usually release records related to a third party "unless the requester establishes a public interest in disclosure that outweighs the third party's privacy interests." Dkt. 57-2 at 19 (Seidel Decl. ¶ 41) (describing the FBI's "longstanding policy" to issue a Glomar response to requests for information regarding third parties).

claimed to have faxed a response to the FBI within the 30-day window and provided the FBI with confirmation that her fax had been delivered.  Dkt. 57-3 at 12–13.

Either way, a few months later, the FBI reopened Tran's request after an attorney representing Tran contacted the agency.  Dkt. 57-8 at 2 (Defs.' SUMF ¶ 5); Dkt. 57-3 at 10. After further review of the responsive files, the FBI sent a letter to Tran's attorney with an updated estimation of the page count and, once again, asked whether Tran would like to reduce the scope of the request to keep processing costs down.  Dkt. 57-3 at 18.  The letter also asked that the attorney "respond [] within 30 days" and cautioned that "[f]ailure to respond will result in this request being closed administratively."  *Id.*  The FOIA process seems to have stalled at that point.  Neither the FBI nor Tran has provided any information as to whether Tran's attorney responded or whether, if not, the FBI administratively closed the case as it had warned it would.

Three years later, Tran began again.  On October 12, 2017, he submitted three additional requests to the FBI seeking all records from 1997 through 2017 concerning his prosecution and the investigation leading up to it.  Dkt. 57-8 at 2 (Defs.' SUMF ¶ 7); *see also* 57-3 at 20–32 (Ex. G).  He also sought all information about the "Government's publicly known witness Alex T. Dao," who he alleged was a "TOP ECHELON FBI/Dep't of Justice Informant" used in the FBI's investigation and prosecution of Tran, Dkt. 57-3 at 22, and for information related to "Andrew Cho," who, on Tran's telling, "conspired with" Dao.  *Id.* at 26.  Tran, again, provided neither privacy waivers nor proofs of death for Dao or Cho.  Dkt. 57-8 at 2 (Defs.' SUMF ¶ 7).  Shortly thereafter, Tran submitted a separate request to EOUSA, seeking "all documents . . . supporting

Vo Tran's actual, factual & legal innocence & that the FBI & Dep't of Justice's retaliated against

Vo Tran because Vo Tran filed complaints against his superiors at the FBI."  Dkt. 57-7 at 3.[2]

In February 2018, the FBI informed Tran's attorney that it had located approximately

5,208 potentially responsive pages and again notified her of the opportunity to narrow the scope

of the request to reduce the cost of processing.  Dkt. 57-8 at 3 (Defs.' SUMF ¶ 12).  This time,

Tran's counsel took the FBI up on its offer and reduced the scope such that there were only 931

pages remaining.  *Id.*  Instead of waiting for those 931 pages to be processed, however, he filed

this action a few weeks later demanding "all" of the responsive records.  Dkt. 1 at 17.

While this case was pending, the FBI and EOUSA released multiple records to Tran in

multiple tranches between December 2018 and November 2022.  The FBI made 33 releases of

records consisting of 5,808 total pages, 2,371 pages of which were released in full and 3,437

pages of which were released in part.  Dkt. 57-2 at 86 (Seidel Decl. ¶¶ 174–75); Dkt. 57-4 at 76

(Ex. RR).  It withheld 1,014 unique pages in full (i.e., 4,205 pages were "duplicative of other

pages accounted for elsewhere in the FBI's production").  Dkt. 57-2 at 86–87 (Seidel Decl.

¶ 176).  The FBI withheld documents pursuant to Privacy Act Exemptions (j)(2), (k)(2), and

(k)(6), and FOIA Exemptions 3, 5, 6, 7(C), 7(D), and 7(E), while EOUSA asserted FOIA

Exemptions 3, 5, 6, and 7(C).  Dkt. 57-1 at 11.  The FBI also issued a set of standard Glomar

responses declining to confirm or deny the existence of any records that "may implicate

classified or unclassified intelligence records," that would "implicate[] unacknowledged records

concerning an individual," that "could identify a participant in the Witness Security Program,"

---

[2] Before receiving an answer from the FBI, Tran appealed to the OIP asking that OIP order the
FBI to hand over all of the records he requested.  Dkt. 57-8 at 3 (Defs.' SUMF ¶ 9).  The OIP
responded that Tran could not appeal unless and until the FBI made an adverse determination on
his request.  *Id.* (Defs.' SUMF ¶ 11).

that would point to "the existence of an individual's name on a watch list," or that would "concern[] the [unacknowledged] use of confidential human sources in the context of a specific investigation." Dkt. 57-2 at 87–88 (Seidel Decl. ¶¶ 177–80). Finally, the FBI declined to search for any records related to Dao or Cho and, instead, issued a Glomar response neither confirming nor denying existence of such records. *Id.* at 19–20 (Seidel Decl. ¶ 41, 45). In support of that separate Glomar response, the FBI invoked FOIA Exemptions 6 and 7(C), which protect the privacy interests of third parties. *Id.* The FBI declined to search for any records relating to Dao or Cho because "when the FBI asserts a privacy Glomar, it is policy not to conduct a search for responsive records because the nature of the requested records alone prohibits acknowledgement and disclosure." *Id.* at 20 (Seidel Decl. ¶ 45).

EOUSA, which coordinated the document production among the fifteen U.S. Attorney's Offices that conducted searches for responsive records, made six productions, ultimately releasing 348 pages in full and 24 pages in part and withholding 92 pages in full. Dkt. 57-6 at 6 (Francis Decl. ¶ 26). EOUSA withheld records in whole or in part pursuant to FOIA Exemptions 3, 5, 6, and 7(C). Dkt. 57-1 at 11.

Defendants' motion for summary judgment, *see* Dkt. 57, which Tran opposes, *see* Dkt. 63, is currently before the Court.

## II. LEGAL STANDARD

Congress enacted FOIA "to ensure public access to a wide range of government reports and information[,] . . . to pierce the veil of administrative secrecy[,] and to open agency action to the light of public scrutiny." *Bartko v. Dep't of Just.*, 898 F.3d 51, 61 (D.C. Cir. 2018) (quotation marks and citations omitted). "The basic purpose of FOIA is to ensure an informed citizenry, [which is] vital to the functioning of a democratic society[ ] [and] needed to check

6

against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). Simply put, "FOIA protects the basic right of the public 'to be informed about what their government is up to.'" *Hall & Assocs. v. EPA*, 956 F.3d 621, 624 (D.C. Cir. 2020) (quoting *Competitive Enter. Inst. v. Off. of Sci. & Tech. Pol'y*, 827 F.3d 145, 150 (D.C. Cir. 2016)). FOIA "requires agencies to disclose records upon request," unless those records "fall within one of nine exemptions," which the Court construes narrowly. *Pavement Coatings Tech. Council v. U.S. Geological Surv.*, 2021 WL 1823300, at *4 (D.C. Cir. May 7, 2021) (citations omitted). The agency bears the burden of justifying its withholdings, and the Court reviews an agency's decision to withhold records or portions of records de novo. 5 U.S.C. § 552(a)(4)(B); *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008).

FOIA cases are typically resolved on motions for summary judgment under Federal Rule of Civil Procedure 56. *Shapiro v. U.S. Dep't of Just.*, 153 F. Supp. 3d 253, 268 (D.D.C. 2016). To prevail on a summary judgment motion, the moving party must demonstrate that there are no genuine issues of material fact and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In a FOIA case, a court deciding a summary judgment motion must "ascertain whether the agency has sustained its burden of demonstrating that the documents requested are . . . exempt from disclosure." *ACLU v. U.S. Dep't of Just.*, 655 F.3d 1, 5 (D.C. Cir. 2011) (cleaned up). An agency can carry its burden and prevail on a motion for summary judgment by presenting affidavits that "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Elec. Frontier Found. v. U.S. Dep't of Just.*, 739 F.3d 1, 7 (D.C. Cir. 2014) (cleaned up). In many cases, an agency may carry its

7

burden by providing a *Vaughn* index that "elucidates, on a document-by-document basis, the rationale for the FOIA exemptions claimed." *Hall & Assocs. v. U.S. Env't Prot. Agency*, 2021 WL 1226668, at *3 (D.D.C. Mar. 31, 2021) (citing *Vaughn v. Rosen*, 484 F.2d 820, 827–28 (D.C. Cir. 1973)). "The description and explanation the agency offers should reveal as much detail as possible as to the nature of the document, without actually disclosing information that deserves protection." *Oglesby v. U.S. Dep't of the Army*, 79 F.3d 1172, 1176 (D.C. Cir. 1996).

### III.  ANALYSIS

Tran requested records related to three people:  Dao, Cho, and Tran himself.  The first two requests—for information about Dao and Cho—were submitted only to the FBI, while he submitted requests for information about himself to both the FBI and EOUSA.  Defendants move for summary judgment with respect to all of their withholdings, as well as their assertion of Glomar responses.  In assessing Defendants' motion, the Court will focus principally on those arguments that Tran raises in his opposition brief and will not review specific withholdings that Tran does not currently dispute.[3]

---

[3]  As this Court has previously observed, even though "'a motion for summary judgment cannot be "conceded" for want of opposition,'" *Shapiro v. U.S. Dep't of Justice*, 239 F. Supp. 3d 100, 106 n.1 (D.D.C. 2017) (quoting *Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 505 (D.C. Cir. 2016), this does not mean "that the Court must assess the legal sufficiency of each and every exemption invoked by the government in a FOIA case, regardless of whether the requester contests the government's invocation of that exemption," *id.*  Rather:

> Where the FOIA requester responds to the government's motion for summary judgment without taking issue with the government's decision to withhold or to redact specific documents, the Court can reasonably infer that the FOIA requester does not seek those specific records or information and that, as to those records or information, there is no case or controversy sufficient to sustain the Court's jurisdiction.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

*Id.*

A.    **Records Related to Alex Trung Dao and Andrew Cho**

In response to Tran's requests for information about Alex Trung Dao and Andrew Cho, the FBI issued a Glomar response in which it declined to confirm or deny the existence of any responsive records.  Under the D.C. Circuit's decision in *Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976), "an agency may refuse to confirm or deny the existence of records where to answer the FOIA inquiry would cause harm cognizable under a[] FOIA exception."  *Gardels v. CIA*, 689 F.2d 1100, 1103 (D.C. Cir. 1982).  A Glomar response "is proper if the existence *vel non* of an agency record is itself exempt from disclosure."  *Moore v. CIA*, 666 F.3d 1330, 1333 (D.C. Cir. 2011).

As relevant here, because members of the public have a "'substantial' privacy interest . . . 'in ensuring that their relationship to [law enforcement] investigations remains secret,'" *People for the Ethical Treatment of Animals v. National Institutes of Health*, 745 F.3d 535, 541 (D.C. Cir. 2014) (hereinafter "*PETA*") (quoting *Roth v. Dep't of Justice*, 642 F.3d 1161, 1174 (D.C. Cir. 2011)), the FBI may decline to confirm or deny the existence of records relating to a third party on the ground that the existence or nonexistence of any such records is itself protected by a relevant FOIA exemption.  *See Shapiro v. U.S. Dep't of Justice*, 153 F. Supp. 3d 253, 274 (D.D.C. 2016).  "In other words, if the agency can withhold access to responsive records under FOIA, it stands to reason that it should also be able to refuse to confirm or deny the existence of records when it is necessary to protect precisely the same information."  *Id.*   Significantly, a Glomar response does not imply that the records at issue, in fact, exist; to the contrary, a Glomar response posits that the question whether (or not) the records exist is itself exempt from disclosure under FOIA.  *See PETA*, 745 F.3d at 540; *Roth*, 642 F.3d at 1178; *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007).

Here, the FBI responded to Tran's request for records relating to Dao and Cho with its standard Glomar response.   The agency wrote:

> You have requested records on one or more third party individuals.  Please be advised the FBI will neither confirm nor deny the existence of such records pursuant to FOIA exemptions (b)(6) and (b)(7)(C), 5 U.S.C. § 552(b)(6) and (b)(7)(C).  The mere acknowledgement of the existence of FBI records on third party individuals could reasonably be expected to constitute an unwarranted invasion of personal privacy.  This is our standard response to such requests and should not be taken to mean that records do, or do not, exist.  As a result, your request has been closed.

*See*, *e.g.*, Dkt. 57-5 at 2.  Michael Seidel, the Section Chief of the FBI's Record/Information Dissemination Section ("RIDS"), expands upon this explanation in his declaration in this case. He observes that the FBI has a "longstanding policy" of "neither confirming nor denying the existence or nonexistence of law enforcement records" when "an individual seeks access to information regarding a third party, unless" a sufficient "public interest in disclosure . . . outweighs the third party's privacy interests."  Dkt. 57-2 at 19 (Seidel Decl. ¶ 41).  That policy is premised on settled law recognizing "that individuals have substantial privacy interests in relation to being associated with law enforcement investigations because any such association can engender comment, speculation, or harassment; can be embarrassing and stigmatizing; and can, in some circumstances, result in physical harm or threats of harm or death."  *Id.*  Seidel further avers that "[s]tatements by an individual alluding to or acknowledging an association with law enforcement investigations do not extinguish his privacy interests or constitute a waiver of privacy interests."  *Id.*

To be sure, this privacy interest may prove insufficient to sustain a Glomar response, but only if the public interest in disclosure of the specific relationship at issue outweighs the underlying privacy interest, or if the FOIA requester submits either "a privacy waiver from the third party" or "proof of death of that third party."  *Id.* at 19-20 (Seidel Decl. ¶¶ 42–43).  Here,

however, Tran—at least on the FBI's telling—has failed to identify any public interest in disclosure, much less one that would outweigh the privacy interests of the two individuals at issue, and the undisputed record establishes that Tran did not submit a privacy waiver or proof of death for either of those individuals. *Id.* at 20 (Seidel Decl. ¶ 43).

For the most part, Tran does not take issue with this line of reasoning. With respect to Andrew Cho, he offers no response whatsoever, and, the Court, accordingly, concludes that the FBI properly issued a Glomar response to Tran's request for those records. With respect to Alex Trung Dao, moreover, Tran does not dispute that third parties, in general, have a significant privacy interest in avoiding release of records that might tie them to a law enforcement investigation, nor does he dispute that he failed to provide the FBI with privacy waiver or proof of death. Instead, he argues that Dao himself revealed, and the FBI officially acknowledged, that Dao alleged served as "undercover informant" for the FBI in its investigation of Tran. *See* Dkt. 63 at 4-6. He further argues that Dao "ceased to be a CI for the Defendants over thirteen . . . years ago" and that, given this passage of time, the FBI cannot plausibly maintain that release of the requested information would pose any "risk whatsoever to" Dao's safety. *Id.* at 6.

Tran's arguments, accordingly, fall into two general categories. First, he contends that the FBI is precluded from asserting a Glomar response with respect to information that it has officially acknowledged. Second, he contends that the agency's Glomar response fails because indicating whether any responsive records exist would not result in the disclosure of any information protected by FOIA Exemptions 6 or 7(C).

1. *Official Acknowledgement*

The parties agree that, if an "agency has officially acknowledged the existence of [a] record, the agency can no longer use a Glomar response, and instead must either: (1) disclose the record to the requester or (2) establish that its contents are exempt from disclosure and that such

exemption has not been waived." *Moore*, 666 F.3d at 1333 (internal citation omitted); *see also*

*Boyd v. Criminal Div. of U.S. Dep't of Just.*, 475 F.3d 381, 388–89 (D.C. Cir. 2007) ("Where an

informant's status has been officially confirmed, a Glomar response is unavailable, and the

agency must acknowledge the existence of any responsive records it holds.").  "A strict test,"

however, "applies to claims of official disclosure." *Wilson v. CIA*, 586 F.3d 171, 186 (2d Cir.

2009).  As the D.C. Circuit has explained:

> For information to qualify as "officially acknowledged," it must satisfy three criteria: (1) the information requested must be as specific as the information previously released; (2) the information requested must match the information previously disclosed; and (3) the information requested must already have been made public through an official and documented disclosure. *Wolf*, 473 F.3d at 378; *Fitzgibbon*, 911 F.2d at 765.  As we further explained in *Wolf*, "[p]rior disclosure of similar information does not suffice; instead, the specific information sought by the plaintiff must already be in the public domain by official disclosure. This insistence on exactitude recognizes the Government's vital interest in information relating to national security and foreign affairs." 473 F.3d at 378 (citations and quotation omitted).

*ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 620–21 (D.C. Cir. 2011); *see also Montgomery v.*

*IRS*, 40 F.4th 702, 710 (D.C. Cir. 2022) (applying three-part test to Golmar response declining to

confirm or deny existence of records relating to alleged confidential informant).

According to Tran, the FBI has previously confirmed "the identity of [Dao] as a CI."

Dkt. 63 at 9.  He contends that the FBI confirmed Dao's identity in two ways: first, by

responding to a complaint filed by Dao in the Court of Federal Claims, in which Dao alleged that

he was a confidential informant and that the FBI had reneged on promises made in connection

with that work, *see id.* at 4–6, and, second, by disclosing to the public that Dao was a

confidential informant "during the course of legal proceedings prosecuted by the Defendants

against [Tran] in 2010."  *Id.* at 6.

**a.**

Tran first argues that the FBI officially acknowledged Dao's purported status as a confidential informant in its response to the complaint filed by Dao in the U.S. Court of Federal Claims.  *Id.* at 4-5.  In July 2010, Dao filed suit against the United States, asserting a claim "for breach of contract and consequential damages . . . related to [his] work as an undercover informant for the Department of Justice, Federal Bureau of Investigation."  *Id.* at 12 (Ex. 1).[4] His complaint alleged that he "began working with the FBI" in 2003 and "worked with four to ten different agents and other agencies on various federal criminal investigations" until 2007.  *Id.* at 13–14 (Ex. 1).  As relevant here, the complaint further alleged that "FBI agents sought [Dao's] assistance in investigating and prosecuting . . . Tran due to [Dao's] . . . business ties to the Asian community, close relationships to the numerous Asian gangs, and ultimately Dao's tenure and respect [he'd] earned while working with the FBI and striving to build his businesses."  *Id.* at 14–15 (Ex. 1).  The complaint also alleged that, if Dao's status as "an undercover agent" was discovered, "it was foreseeable that [he] would be in extreme jeopardy and would have to give up his businesses and properties, move, and begin a different life."  *Id.* at 15 (Ex. 1).  Dao maintained that the FBI had agreed to pay him $500,000 for this dangerous work and "to place [him] into the government's witness security ('WITSEC') program in the event his identi[t]y ever became public."  *Id.*

According to Dao's complaint, the FBI breached its agreement with him by failing to keep his "identity secret," by failing to place him "into the WITSEC program" by the time Dao

---

[4]  According to Dao's complaint, he made use of "a pseudonym name in the caption and [was] acting through his attorneys."  Dkt. 63 at 13.  Because neither party addresses whether "Trung 'Alex' Dao" is a pseudonym and, if so, what bearing that fact would have on the pending motion, the Court will not rely on Dao's possible use of a pseudonym for present purposes.

brought suit in 2010, and by failing to pay him the agreed-upon sum. *Id.* at 17 (Ex. 1). Dao also attached a letter sent from the Department of Justice to his attorney that referred to nearly $190,000 in various payments Dao had received from the FBI, though Dao alleges that he only received $45,000 for "actual compensation" and an additional $94,000 in "expense reimbursement." *Id.* at 45 (Ex. 1).

Even accepting the authenticity of Dao's complaint for present purposes, it does not constitute an official acknowledgement that Dao served as a confidential informant for the FBI. To start, "[c]ourt[s] will not accept the allegations in a complaint in another case as true *per se*." *Parisi v. Sinclair*, 774 F. Supp. 2d 310, 316 (D.D.C. 2011). But, even more importantly, those allegations were made by a lawyer representing Dao and not by any government official. In short, the complaint does not constitute "an official and documented disclosure," *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990), of anything at all. Tran recognizes as much and seeks to bolster his claim of official acknowledgement by pointing to two documents filed by the Department of Justice in the Court of Federal Claims case.

*First*, he points to Defendant's Reply in Support of Its Third Motion for an Enlargement of Time, in which counsel for the United States explained that she needed additional time to contact the Bureau of Alcohol, Tobacco and Firearms ("ATF") and the United States Attorney's Office referenced in the complaint to prepare a motion to dismiss and/or for summary judgment. Dkt. 63 at 51-52 (Ex. 2). On Tran's reading, this motion "stated that one of the primary contacts for [Dao] as a CI was Assistant United States Attorney Robert Keenan" and acknowledged "that the FBI does indeed possess documentary evidence regarding [Dao]." *Id.* at 5.

Tran's contention that the government acknowledged that he was a CI working with Assistant United States Attorney Robert Keenan misreads the filing. Rather, the government

merely noted that it had determined that Keenan was Dao's contact at the United States Attorney's Office. *Id.* at 52. It did not say that Dao was a confidential informant and, indeed, it characterized Dao's allegations as "vague and confusing" and as unfounded. *Id.* The government's assertion that Keenan was one of Dao's primary contacts, accordingly, does not come close to satisfying the "strict" three-part test for finding an agency has officially acknowledged the specific information that it seeks to protect through use of Glomar response.

Tran's second argument, however, has greater—albeit limited—purchase. The government's motion for an extension of time in the Court of Federal Claims litigation did assert that "the FBI and ATF both have documentary evidence that establishes that the agents specifically advised Mr. Dao that they were not making the promises [he] alleges in his complaint." *Id.* By making this assertion, the government officially acknowledged that the FBI (at least at that time) possessed records relating to Dao and his contention that he served as a CI. Although the FBI might well have grounds to withhold these records under a relevant FOIA exemption (or to conclude that they are not responsive to Dao's requests), it cannot maintain that by merely acknowledging that the records exist, it will have done the harm that a FOIA exemption is designed to prevent. *See Roth*, 642 F.3d at 1178. The government represented to a court in no uncertain terms that the FBI has (or at least had) potentially responsive "documentary evidence," and the FBI must now either release those records or explain why it is not required to do so. It cannot plausibly maintain that merely confirming that those previously acknowledged records, in fact, exist "would trigger" any new or additional "harm under FOIA Exemptions . . . (b)(6) and (b)(7)(C) with respect to Alex Dao." Dkt. 57-2 at 18 (Seidel Decl. ¶ 40).

*Second*, Tran points to the government's motion to dismiss Dao's complaint in the Court of Federal Claims litigation. *See* Dkt. 63 at 56–84 (Ex. 3). In particular, he notes that, in setting

forth the relevant facts, the government observed that "Dao assisted the Government in the investigation and eventual trial of a former FBI special agent, Vo Duong 'Ben' Tran," *id.* at 62, and he argues that "[b]y virtue of" this "filing," the government "admitted that D[ao] was indeed a CI working with them since at least 2003," *id.* at 5. But that contention ignores the two sentences that preceded that purported admission: "For the purposes of this motion only, the facts are not in dispute. In the event that this motion is denied, we reserve the right to contest each of the allegations contained in the complaint." *Id.* at 62. That, of course, is how motions to dismiss work. The defendant assumes, without conceding, that the factual allegations contained in the complaint are true and then argues that the complaint, nonetheless, fails to state a claim as a matter of law. The Court, accordingly, concludes that Tran has not provided evidence that Dao's purported status as a confidential informant was officially confirmed. As a result, nothing contained in the government's motion to dismiss the Dao complaint constitutes a concession— much less an official acknowledgement—that Dao served as a CI for the FBI.

The Court, accordingly, concludes that the government officially acknowledged that the FBI possessed "documentary evidence" relating to advice "the agents" gave to Dao "that they were not making the promises [he] allege[d] in his complaint," Dkt. 63 at 52. But that is the only thing that the government acknowledged in the Court of Federal Claims litigation. As to that narrow acknowledgement, the FBI must now either produce those documents to Tran or justify withholding them based on a particular FOIA exemption. *See Moore*, 666 F.3d at 1333.

**b.**

Tran also maintains that the government officially acknowledged Dao's purported status as a confidential informant "during the course of legal proceedings prosecuted by the Defendants against [Tran] in 2010." Dkt. 63 at 6. In support, Tran cites to an in the *Orange County*

*Register.  See id.*  The government responds by noting the article is paywall protected, *see* Dkt. 68 at 7 n.7, but says nothing about whether Dao was identified by the United States or the public at Tran's trial.  Defendants do assert that "[t]he government did not 'explicitly disclose' anything in this article."  *Id.* at 7.  But it is unclear from that assertion whether the government means to suggest that no government official spoke with the Orange County Register reporter or whether Plaintiff's contention that Dao testified as a government witness at his trial is false.  Before the Court can grant summary judgment in favor of Defendants, it requires greater clarity regarding whether Dao in fact testified as a witness for the government at Tran's trial and whether his name was revealed in connection with that proceeding.  If so, the government needs to explain how disclosure of whether the FBI has records that mention Dao by name would itself reveal information protected by an applicable FOIA exemption.  *Boyd*, 475 F.3d at 388–89; *see also Pickard v. Dep't of Just.*, 653 F.3d 782, 787–88 (9th Cir. 2011).  This is not to say that, even if the United States referred to Dao by name at Tran's trial, Defendants would be precluded from invoking any available FOIA exemptions with respect to records that mention or refer to Dao.  But the government would need to explain why a Glomar response is nonetheless appropriate or would need to perform a search, produce a *Vaughn* index, and assert any applicable FOIA exemptions with respect to specific records.  In short, if Dao's connection to Tran's prosecution is already a matter of public record—a question on which the Court expresses no opinion—the FBI will be unable to maintain that merely confirming that the FBI possesses documents that mention Dao by name would violate his right to privacy.

*   *   *

The Court will, accordingly, **GRANT** Defendant's motion for summary judgment with respect to the Glomar response issued in response to Tran's request for records concerning

17

Andrew Cho and will **DENY** without prejudice Defendants' motion for summary judgment with respect to the Glomar response issued in response to Tran's request for records concerning Alex Trung Dao.

## B.    Records Related to Vo Tran

In contrast to the FBI's Glomar response to Tran's request for records referring to Dao or Cho, Tran's request for records about himself proceeded in the usual FOIA fashion. The FBI and EOUSA performed searches in response to Tran's request, and those searches returned several thousand records, many of which Defendants processed over the course of this litigation. After processing those records, the FBI withheld 1,014 unique pages (or 5,219 pages counting those withheld as duplicative) and produced 5,808 total pages, of which 2,371 pages were released in full and 3,437 pages were released in part. Dkt. 57-2 at 86–87 (Seidel Decl. ¶¶ 174–76). EOUSA withheld 92 pages and released 348 pages in full and 24 pages in part. Dkt. 57-6 at 6 (Francis Decl. ¶ 26).

It is unclear what Tran intends to challenge with respect to Defendants' responses to his request for records about himself because he says very little about those records. *See generally* Dkt. 63. But despite Tran's sparse briefing, the Court must satisfy itself that summary judgment is appropriate and must ensure that Defendants conducted adequate searches and released all non-exempt, segregable material. Before turning to those issues, however, the Court pauses to consider the one argument that Tran raises in his opposition brief, which focuses on a purported discrepancy between the number of pages that Tran alleges have been withheld (23,000) and the number of pages Defendants report having withheld (5,311).

### 1.    *Alleged Discrepancy*

In Tran's opposition to Defendants' motion for summary judgment, he contends that there is a discrepancy between Defendants' initial estimate of responsive pages (29,909) and the

number of pages produced to him (6,108).  Dkt. 63 at 7.  According to Tran, that means that,

rather than withholding 5,311 pages in full (as Defendants reported in their declarations),

Defendants have actually withheld "at least 23,000 pages."  *Id.*  Tran attributes that discrepancy

to the FBI's Glomar response.  That explanation, however, seems unlikely for at least two

reasons.  First, the FBI represents that it did not even complete a search for records related to

Dao or Cho.  Second, the initial estimated page count of 29,909 came not from the FBI (which

asserted the challenged Glomar response) but from EOUSA (which was never tasked with

searching for records concerning Dao or Cho in the first place and which did not issue a Glomar

response, *see generally* Dkt. 57-6).  Dkt. 20.

Here is what the Court can determine with respect to the page-count discrepancy.  In a

status report filed on March 14, 2019, EOUSA estimated that three U.S. Attorney's Offices had

identified approximately 29,909 pages of responsive records as follows: "Northern District of

Georgia: approximately 24,000 pages. Northern District of Illinois: approximately 5,500 pages.

Central District of California: approximately 409 pages."  Dkt. 20 at 1.  EOUSA repeated that

count in a second status report on April 15, 2019.  *See* Dkt. 21.  In its next status report, however,

EOUSA reported (without comment as to the discrepancy) that it had received "a total of 5,838

pages from Northern District of Illinois, Northern District of Georgia, and Central District of

California."  Dkt. 22.  No reference to the additional twenty-odd-thousand documents ever

reappeared.  *See, e.g.*, Dkt. 26 (estimating approximately 5,513 pages total to be reviewed by

EOUSA).  According to a declaration from Tricia Francis from EOUSA and declarations from

representatives from the relevant districts, the initial estimates for responsive documents in the

Northern District of Illinois and the Central District of California matched the number of

documents sent to EOUSA by those districts.  *See* Dkt. 57-6 at 4 (Francis Decl. ¶ 12); Dkt. 57-7

19

at 9 (Rhedrick Decl. ¶ 10) (C.D. Cal.: 409 pages); *id.* at 14 (Payne Decl. ¶ 18) (N.D. Ill.: 5,513 pages).

The Northern District of Georgia's ultimate production, however, differed dramatically from that office's initial estimate.  EOUSA initially reported that the Northern District of Georgia had identified 24,000 pages of potentially responsive records, Dkt. 20 at 1, but later received only 75 pages to process from that office.  *See* Dkt. 57-7 at 19 (Todd Decl. ¶ 12). Defendants never explain where the initial estimate came from.  *See* Dkt. 57-7 at 17–19 (Todd Decl.).  Defendants' reply brief is likewise unhelpful.  Defendants merely assert that the "so-called page count discrepancy is nothing of the sort" because there is a difference between "responsive" pages and "produced" pages.  Dkt. 68 at 9.  That is, of course, true, but unilluminating under the circumstances.  It offers no explanation, for example, for the discrepancy between the number of pages that EOUSA now says that it withheld and the many pages that were initially identified but were neither released nor included in the count of withheld records.

Because Defendants bear the burden of demonstrating that an adequate search was conducted and, at summary judgment, must show that no material dispute exists regarding the relevant facts, the Court will **DENY** Defendants' motion for summary judgment without prejudice, pending some further explanation for the discrepancy.  For present purposes, it is not enough to include a two sentence, conclusory paragraph in a reply brief that is unsupported by any declaration or other evidence.

2.    *Adequacy of the Search*

In other respect, the Court is satisfied that Defendants conducted an adequate search for potentially responsive records.  The adequacy of an agency's search "is judged by a standard of reasonableness."  *Weisberg*, 745 F.2d at 1485.  That is, the agency must conduct a search that is

"reasonably calculated to uncover all relevant documents." *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (quoting *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990)).  To prevail on summary judgment, "the agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).  An agency need not demonstrate, however, that it located every document that the FOIA requester expected the agency to find because "the adequacy of a search is 'determined not by the fruits of the search, but by the appropriateness of [its] methods.'" *Hodge v. FBI*, 703 F.3d 575, 579 (D.C. Cir. 2013) (alteration in original) (quoting *Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003)).

In support of their motion for summary judgment, Defendants submit several declarations describing their extensive searches.  The Seidel declaration explains how the FBI conducted its search for records related to Tran.  Dkt. 57-2 at 21–26 (Seidel Decl. ¶¶ 46–62).  He explains that RIDS started by conducting "a search of the FBI's Central Records System."  Dkt. 57-2 at 21 (Seidel Decl. ¶ 46).  That record system "spans the entire FBI organization and encompasses the records of FBI Headquarters [], FBI Field Offices, and FBI Legal Attaché Offices [] worldwide." Dkt. 57-2 at 21 (Seidel Decl. ¶ 46).  It "consists of a numerical sequence of files" that are "indexed for future retrieval" based on "general indices [that] fall into two category types:" main entries and reference entries.  Dkt. 57-2 at 21–22 (Seidel Decl. ¶¶ 47–48).  Main entries concern "individual[s]" that are "the subject or focus of an investigation," while reference entries concern "individuals . . . associated with [a] case but [that] are not the main subject(s) or focus of an investigation."  Dkt. 57-2 at 22 (Seidel Decl. ¶¶ 49–50).  Here, the FBI searched the main entries for records relating to the search terms "Tran, Vo, D" and "Tran, Vo, Duong" using "an index

search methodology" that can be "reasonably expected to locate responsive material within the vast [Central Records System]." Dkt. 57-2 at 25–26 (Seidel Decl. ¶¶ 59–60). That search yielded 3,262 responsive pages. Dkt. 57-2 at 26 (Seidel Decl. ¶ 60). The FBI then expanded its search to include "both main and reference files containing records responsive to Plaintiff's request" and to encompass additional search terms related to the alias "Ben Tran." Dkt. 57-2 at 26 (Seidel Decl. ¶ 62). That search yielded "an additional 7,765 pages of potentially responsive records, totaling 11,027 pages" between both searches, some of which later turned out to be duplicates. Dkt. 57-2 at 26 (Seidel Decl. ¶ 62).

Defendants also rely upon the Francis declaration. Dkt 57-6 at 1. Her declaration explains how EOUSA oversaw the search for records related to Tran, his "criminal investigation and [his] prosecution by federal authorities" located in the fifteen different federal district court jurisdictions identified by Tran in his request. Dkt. 57-6 at 2 (Francis Decl. ¶ 6). In late 2018, EOUSA requested that each of those districts search for responsive records. Dkt. 57-6 at 2 (Francis Decl. ¶¶ 8–9). FOIA Officers in each of these districts have filed declarations detailing their searches. *See* Dkt. 57-7 at 7–70. Twelve of the districts located no responsive records. Dkt. 57-6 at 3–4 (Francis Decl. ¶ 11). Three districts located potentially responsive records and provided them to EOUSA for processing: the Northern District of Georgia (75 pages), the Northern District of Illinois (5,500 pages), and the Central District of California (409 pages). Dkt. 57-6 at 4 (Francis Decl. ¶ 12).

Except as discussed above, Tran does not contest the adequacy of these searches, and based on the evidence presented in the seventeen declarations that Defendants have submitted, the Court is satisfied that the Defendants' searches were thorough and "reasonably calculated to uncover all relevant documents." *Valencia-Lucena*, 180 F.3d at 325. The Court will,

accordingly, **GRANT** in part and **DENY** in part (for the reasons explained above) summary judgment to Defendants with respect to the adequacy of the search for records related to Tran.

    3.    *Withholdings*

Tran lodges only two broadbrush challenges to Defendants' withholdings:  First, he alleges (without explication) that "any other rationale cited by the Defendants for failure to comply with FOIA [is] easily dismissed."  Dkt. 63 at 8.  Second, he requests either that the Court order Defendants to produce all "23,000" withheld pages to him under seal or that the Court review each of those documents *in camera* to determine individually whether each merits withholding.  Dkt. 63 at 8.

Tran's first argument requires little response.  *Ipse dixit* invites *ipse dixit*.  Without understanding why Tran contends that Defendants failed to comply with FOIA, neither Defendants nor the Court can meaningfully respond.  The Court can observe, however, that Defendants have taken Tran's requests seriously, have engaged in an extensive search for responsive records, have offered multiple declarations explaining their efforts, and have submitted a detailed and extensive *Vaughn* index.  If some "other rationale cited by Defendants" for withholding responsive records is flawed, that flaw is neither evident to the Court nor mentioned in Tran's brief.

Tran's second argument is equally meritless.  He provides no justification for his extraordinary request that the Court engage in an *in camera* review of 23,000 pages of withheld records, other than invoking the principle that "disclosure, not secrecy, is the dominant and overriding objective of the FOIA."  *Id.* (citing *Patterson v. IRS*, 56 F.3d 832, 835 (1995)).  Indeed, it is unclear whether these 23,000 pages of records even exist; if so, whether they are subject to the requirements of FOIA, *see* 5 U.S.C. § 552(c); and whether they are, in any event, responsive to Tran's FOIA request.  As explained above, the Court will require Defendants to

offer a more complete explanation for the discrepancy between the Northern District of

Georgia's initial estimate of potentially responsive records and the records either produced or

included in Defendants' *Vaughn* index.  When Defendants do so, it is possible that the Court will

need to engage in a limited, *in camera* review of the records at issue or Defendants'

supplemental declaration.  The question whether the Court will need to do so, however, is—at

the very least—premature.  Finally, to the extent that Tran connects the 23,000 pages of records

that he asks the Court to review *in camera* to the FBI's Glomar response, the Court is

unpersuaded that *in camera* review is necessary or appropriate.  The FBI has adequately

explained the basis for its Glomar response, and as discussed below, this is not a case in which

there is "evidence of bad faith on the part of the agency," s*ee Quinon v. FBI*, 86 F.3d 1222, 1228

(D.C. Cir. 1996).  As a result, *in camera* review would serve no purpose.  *See Larson v. Dep't of

State*, 565 F.3d 857, 870 (D.C. Cir. 2009).

The Court will, accordingly, **GRANT** summary judgment in favor of Defendants with

respect to the withholdings identified in their *Vaughn* indices.

4.    *Segregability*

The Court must also consider *sua sponte* whether the FBI and EOUSA have produced all

segregable, non-exempt information.  *See Morley v. CIA*, 508 F.3d 1108, 1123 (D.C. Cir. 2007)

("[T]he District Court ha[s] an affirmative duty to consider the segregability issue *sua sponte*."

(quoting *Trans-Pac. Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1028 (D.C. Cir.

1999))).  To establish that all reasonably segregable, non-exempt information has been disclosed,

Defendants bear the burden of demonstrating "with 'reasonable specificity'" that the information

it withheld cannot be further segregated.  *Armstrong v. Exec. Office of the President*, 97 F.3d

575, 578 (D.C. Cir. 1996).

Here, the FBI attests that it performed a segregability review, Dkt. 57-2 at 86–87 (Seidel Decl. ¶¶ 173–76), and it has produced a *Vaughn* index identifying its withholdings, *see* Dkt. 57-5 (Ex. CCC). Seidel attests that, following the review, "RIDS determined that 2,371 pages could be released in full without redaction as there was no foreseeable harm to an interest protected by a FOIA exemption." Dkt. 57-2 at 86 (Seidel Decl. ¶ 174). RIDS also determined that "3,437 pages could be released in part with redactions per the identified FOIA exemptions." *Id.* (Seidel Decl. ¶ 175). Those pages contained "a mixture of material that could be segregated for release and material that was withheld as release would trigger foreseeable harm to one or more interests protected by the cited FOIA exemptions." *Id.* Finally, "RIDS determined that 5,219 pages required withholding in their entirety." *Id.* (Seidel Decl. ¶ 176). Out of the pages withheld in their entirety, however, 4,205 were withheld as "duplicative of other pages accounted for elsewhere in the FBI's production." *Id.* at 87 (Seidel Decl. ¶ 176). Only 1,014 unique pages were entirely withheld. *Id.* To justify the decision, Seidel explains:

> RIDS determined that all information on 1,014 . . . pages was either fully covered by one or more of the cited FOIA exemptions or determined that any non-exempt information on these pages was so intertwined with exempt material, no information could be reasonably segregated for release. Any further segregation of this intertwined material would employ finite resources only to produce disjointed words, phrases, or sentences, that taken separately or together, would have minimal or no informational content.

*Id.* at 86–87.

EOUSA has likewise attested to its segregability review, Dkt. 57-6 at 31–32 (Francis Decl. ¶¶ 97–100), and it has also produced a *Vaughn* index identifying its withholdings, *see* Dkt. 57-7 at 102–60. Francis attested that, while "reviewing the responsive material, EOUSA staff conducted a detailed, line-by-line review to satisfy EOUSA's reasonable segregability obligations, including evaluating all materials under the foreseeable harm standard." Dkt. 57-6 at 31 (Francis Decl. ¶ 99). After that review, "EOUSA determined that there was no reasonably

segregable, non-exempt information that was releasable to Plaintiff." *Id.* at 32 (Francis Decl. ¶ 100).

Tran does not challenge the FBI's or EOUSA's segregability analyses, and the Court has no reason to doubt the agencies' good-faith representations. Accordingly, the Court is satisfied that Defendants have produced all segregable, non-exempt records with respect to the pages processed in response to Tran's request for information about himself.

**C.    Allegations of Bad Faith**

Finally, Tran contends that Defendants have acted in bad faith in two respects: he maintains that Defendants' arguments respecting the FBI's Glomar response are "baseless and without merit," and then contends that Defendants have sought repeated extensions of time, which have frustrated his efforts to obtain the records at issue. Dkt. 63 at 7. Neither argument is persuasive.

*First*, the Court has yet to decide whether the FBI's Glomar response was proper; as explained above, the Court requires additional information and briefing before it can decide that question. But, in any event, the Court has no reason to believe that the FBI's position falls outside the bounds of reasonable argument.

*Second*, Tran asks the Court to "take notice of the fact that the record in this matter is rife with a litany of motions for extension of time filed by the Defendants"—seventeen extension requests in total. *Id.* The Court agrees that Defendants in this case requested an unusual number of extensions. Several of the fourteen extension requests occurred early in the litigation and are the types of requests seen in the ordinary course of FOIA litigation. *See* Dkt. 6, 7, 8, 15, 16, 18. More striking are the eight extension requests for filing this motion for summary judgment, which ultimately delayed the filing of this motion from March 22, 2022, to February 23, 2023—

almost an entire year.  *Compare* Min. Entry (Dec. 8, 2021), *with* Min. Entry (Feb. 22, 2023); *see also* Dkt. 48, 49, 51, 52, 53, 54, 55, 56 (extension requests).

Delays with respect to Tran's FOIA requests, however, run both ways.  As discussed above, Tran's failures to respond to the FBI's requests for information and documentation caused yearslong delays before this case was even filed, and Tran's unresponsiveness continued throughout the pendency of this case.  After Tran was released from prison in April 2020, he failed to provide Defendants (or the Court) with a new address, and one of Defendants' productions was returned as undelivered.  Dkt. 32.  Tran did not provide a correct address until September 2020.  Dkt. 35.  He also initially failed to respond to a Court order directing him to provide his position on a potential motion for summary judgment, *see* Min. Entry (Nov. 17, 2021), delaying the Court's ruling on whether such a motion could be filed.  In short, this is not a case in which a diligent requester has been stymied by a recalcitrant agency.  Given that history, Defendants' delays, which were due at least in part to illness on the part of government counsel and to the large number of responsive documents, do not overcome the "presumption of good faith" enjoyed by agencies carrying out the FOIA process.  *Cf. Shem-Tov v. Dep't of Just.*, 2018 WL 11671505, at *1 (D.D.C. Nov. 29, 2018).

## CONCLUSION

For all these reasons, the Court will **DENY** Defendants' motion for summary judgment with respect to the issuance of a Glomar response for the documents related to Dao and **GRANT** summary judgment with respect to the issuance of a Glomar response for the documents related to Cho.  With respect to records about Tran and his criminal case, the Court will **DENY** Defendants' motion for summary judgement as to the adequacy of the search with respect to the discrepancy between the initial estimates and the documents processed, but will **GRANT** summary judgment in all other respects.

**SO ORDERED.**

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  February 6, 2025